UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| Kelli Torres and Ruben Torres, Sr., Individually and as Administrators Ad Prosequendum of the Estate of Ruben Torres, Jr., Deceased, | Hon. Joseph H. Rodriguez<br><br>Civil Action No. 16-02232 |
| Plaintiffs, | OPINION |
| v. | |
| United States of America,<br>Tracy Shebah, D.O.,<br>Ashley N. Long, D.O.,<br>Kenneth Poppen, D.O.,<br>Sara E. Clymer, D.O.,<br>Rachel Morin-Rayburn, D.O.,<br>Jessica Balkema, D.O.,<br>Crystl Dooley, R.N.,<br>Brittany Orzechowski, R.N.,<br>Betina Afanador-Perez, R.N.,<br>Ryan Federico, R.N.,<br>Gina Giuliani, R.N.,<br>Eric M. Bonifield, M.D.,<br>Tammy L. Sheppard, R.N.,<br>Inspira Medical Centers, Inc.,<br>Inspira Medical Centers Vineland,<br>Inspira Health Network,<br>Rowan University School of Medicine,<br>Cumberland Ob/Gyn. | |
| Defendants. | |

This is a medical negligence action arising out of Defendants' alleged mismanagement of Plaintiff Kelli Torres's labor resulting in the delayed delivery of Ruben Torres, Jr. who died four days after his birth. It is presently before the Court on motions for partial summary judgment filed by Defendants regarding Plaintiff Ruben Torres's claim for emotional

distress damages. Defendants argue that partial summary judgment is warranted because Mr. Torres did not immediately connect any act of malpractice with his baby's injuries. Plaintiffs argue that he did not have to make that connection to survive summary judgment. Oral argument was heard on the record on November 29, 2017 and is incorporated here. For the reasons placed on the record that day, and those set forth below, Defendants' motions will be granted.

Background

Plaintiffs' undisputed statement of facts is as follows. Kelli Torres was admitted to Inspira Medical Centers, Inc., Vineland (Inspira Vineland) on October 6, 2013 at or about 1916 for induction of labor. (*See* Compl. at ¶¶113-114.) Induction started at or about 1945. (*See* Compl., at ¶116.) The Plaintiffs' baby, Ruben Torres, Jr., was delivered 3 days later on October 9, 2013 at 1304. (*See* Compl. at ¶299.)

Plaintiffs' Complaint arises out of Defendants' alleged mismanagement of Mrs. Torres's labor including misinterpretation of the electronic monitoring of the fetal heart rate, causing a delay in delivery and subjecting the fetus to a prolonged period of intrapartum hypoxia resulting from the fetus being deprived of oxygen during labor. (*See* Compl. at Counts I, II and III.) In 2013 at Inspira Vineland, the data generated by the

electronic fetal monitor was displayed on a computer monitor. (Dep., Satinderpal Sandhu, M.D., 131:12-24.) Mr. Torres, who was present for the entire labor, was able to see the data as it was displayed on the monitor. (Dep., Ruben Torres, 28:20-23.)

On multiple occasions, the monitor lost its signal. (*See* Dep., Tracy Shebah Wurm, D.O., 100:11-17.) Mr. Torres was aware that the monitor was not functioning properly. (*See*, Dep., Ruben Torres, 41:2-8.) He also observed the nurses adjusting the monitor on several occasions, which he found equally concerning. (*Id.* at 31:24-32:9 & 41:9-15.) Mr. Torres was aware that the monitor was, at times, recording the maternal heart rate in place of the fetal heart rate. (Dep., Ruben Torres, 49:16-22.) Additionally, on the morning of October 9, Mr. Torres overheard the health care practitioners discussing the possible use of a scalp electrode, which is used as an alternate means of obtaining the FHR when there is difficulty in accurately monitoring the FHR with an external monitor. (*See* Dep., Ruben Torres, 42:6-14 and Dep., Tracy Shebah Wurm, D.O., 99:3-14, 99:8-14.)

Mr. Torres recalled that his wife began pushing at about 10:00 a.m. on the morning of October 9, 2013. (Dep., Ruben Torres, 38:22-39:4.) About an hour after his wife starting pushing, Dr. Franco came in and told her to stop pushing because the baby was not "descending all the way

down." (Dep., Ruben Torres, 40:11-21.) When his wife stopped pushing, they allowed her to sit up, which concerned him because earlier that morning he had heard the health care practitioners discussing that when baby's head was down low, they did not want the mom sitting up. (Dep., Ruben Torres, 44:9-17.)

After Mrs. Torres laid down, the nurses were unable to obtain the heart rate with the external monitor for nearly 30 minutes. At that point, someone named "Valerie," who Mr. Torres assumed was a nurse, was brought in to try to obtain the heart rate. It was Mr. Torres's impression that "Valerie" was chosen because she was "supposed to be the best at [finding] a fetus' heart rate." (*Id.* at 46:9-47:2.)

It was only after "Valerie" was unable to find the heart rate that "they []basically[] threw everything on top of Kelli and ran in the hallway." (*Id.* at 47:21-23.) According to the records, this occurred at 1248, several hours after the EFM initially showed difficulty in differentiating between the fetal and maternal heart rate, (*see* Dep., Ylbe Franco-Marx, M.D., 174:10-17), and after the nurse had offered the resident the fetal scalp electrode as a means of gaining a better understanding of the fetal heart rate.

Mr. Torres accompanied Mrs. Torres into the operating room. He was positioned by her head and in front of the privacy drape. Because he was

scared, he did not want to look over the drape. (Dep., Ruben Torres, 52:18-23.) Within a few minutes of arriving in the operating room, he was asked to leave. (*Id.* at 52:18-53:4.) He went back to the room "and a little while later a nurse came to the room . . . and told [him] that when [his son] was born . . . he had to be resuscitated, and that he's not looking good for him, and that he's in the NICU." (*Id.* at 53:11-25.) The nurse was crying when she told Mr. Torres about his son. (*Id.* at 54:18-24.)

The baby was born at 1304. His Apgar scores were 1 at 1 minute, 1 at 5 minutes, 1 at 10 minutes, 1 at 15 minutes and 1 at 20 minutes. Based on his initial Apgar score of 1 at 1 minute, Ruben Torres, Jr. required resuscitation, which initially lasted 24 minutes. (*See* Neonatal Resuscitation Record.) Shortly after, while still in the operating room, he required a second resuscitation. (*See* Neonatal Resuscitation Record.) He was transferred to the NICU at 1339. (*See* NICU Flowsheet.) Between 1339 and 1400, Ruben Torres, Jr. underwent a number of medical interventions including placement of a central catheter, x-ray confirmation of the catheter and the drawing of blood. (*See* Neonatal Flowsheet.)

According to the records, Mr. and Mrs. Torres were first allowed to see their son sometime between 1400 and 1435. At that time, the baby was hooked up to lines and intubated. Although his eyes were open, Mr. Torres

testified "there was nothing there." He was not moving and he was unable to grasp Mrs. Torres's finger. (Dep. Ruben Torres, 55:21-56:15.)

Plaintiffs were told that their son had to be airlifted to Nemours because he needed more care than Inspira Vineland had to offer. (Dep., Ruben Torres, 56:19-57:8.) Mr. Torres saw his son just before he left for Nemours and was able to watch the helicopter as it left Inspira Vineland. (Dep., Ruben Torres, 57:16-19.)

Two days after his birth, Ruben Torres, Jr. was still unable to breathe on his own and remained motionless. (*See* Nemours Discharge Summary.) An EEG taken on October 11, showed an absence of brain activity. (Compl. at ¶293.) Two days after that, on October 13, 2013, on the physician's recommendations, Plaintiffs withdrew all life support. (*See* Compl. at ¶294.) The baby died a few minutes later in his parents' arms. (Compl. at ¶294.)

In his answers to interrogatories, Mr. Torres explained how his son's death has affected him. Mr. Torres has had difficulty expressing himself with increased bouts of anger, headaches, crying spells, seclusion and an inability to participate in normal activities. (Plaintiffs' Answer to Interrogatory 18 of Defendants Shebah, Long, Poppin, Clymer, Morin-Rayburn and Balkema.)

## Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences

7

drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party

cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## Discussion

The issue before the Court is limited to whether Mr. Torres's claim for emotional distress damages survives the Defendants' motions for summary judgment. In Frame v. Kothari, 560 A.2d 675 (N.J. 1989), the New Jersey Supreme Court set forth the standard for an indirect claim for emotional distress resulting from a medical malpractice action. The Frame standard is a modification of the bystander liability standards articulated in Portee v. Jaffee, 417 A.2d 521 (N.J. 1980). "In an appropriate case, if a family member witnesses the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury, that may be sufficient to allow recovery for the family member's emotional distress." Frame, 560 A.2d 675, 681 (N.J. 1989).

In that case, however, the parents' claims for emotional distress resulting from the medical misdiagnosis of their ten-month-old who had fallen down a set of stairs was disallowed because there was no close, temporal connection between the misdiagnosis and blood clot that led to the infant's death. "Merely being on the scene may not be enough. The injury must be one that is susceptible to immediate sensory perception, and the plaintiff must witness the victim when the injury is inflicted or immediately thereafter." Id. at 678. While the negligent physician was exposed to claims for personal injuries and wrongful death, because hours separated the "misdiagnosis, the manifestation of injury to the patient, and the family member's observation of the injury," id. at 678, "[t]he chain of circumstances, although deeply tragic, were not 'shocking.'" Id. at 681.

In Carey v. Lovett, 622 A.2d 1279 (N.J. 1993), the New Jersey Supreme Court established the standard for use in cases where parents seek damages for emotional distress resulting from medical malpractice occurring during their baby's birth. There, health care providers negligently treated the plaintiffs' baby as deceased during labor and delivery, even though the baby was alive. The Court recognized that "[a]ny time a doctor negligently injures a child it is foreseeable that the parents will suffer emotional distress." Id. at 1286. However, neither the normal "worry and

stress" accompanying birth, nor "the upset that every parent feels when something goes wrong in the delivery room" are sufficient to sustain a claim for emotional distress. Id. at 1288.

Rather, the Carey Court noted "that the physical and emotional ties between mother and fetus so unite them that a physician should anticipate that any malpractice that adversely affects the fetus will cause emotional distress to the mother." Id. at 1286. Because "[t]he maternal-fetal relationship bespeaks the genuineness of an otherwise-valid claim for emotional distress[,]" a mother need not be "contemporaneously aware of" or "shocked" by the malpractice. Id. at 1287.

However, the Court reiterated the "special requirements" applicable to indirect claims involving medical malpractice brought by the father, who is required to show that he had "contemporaneously observe[d] the malpractice and its effects on the victim" and "the injury to the victim was 'shocking' in the sense the father did not have time to prepare for the injury." Id. at 1288.[1] "The special requirements for establishing an indirect

---

[1] The Third Circuit has interpreted Carey as holding, "a father should have his own claim if he experiences [severe emotional and mental] distress, provided he stands in an intimate family relationship to the mother and the fetus, contemporaneously observes the malpractice and the effect on the [victim], and is shocked by the results." Abdallah v. Callender, 1 F.3d 141, 147 (3d Cir. 1993).

claim for emotional distress that is based on medical malpractice are strictly applied." Gendek v. Poblete, 654 A.2d 970, 973 (N.J. 1995) (citing Frame, 560 A.2d 675).

In Gendek, the New Jersey Supreme Court did not allow for parents' emotional distress damages arising out of the death of their infant son who was born in apparent good health but developed profound respiratory problems post-birth, resulting in the loss of oxygen to the brain and severe brain damage, and eventually the removal of life support. In the 24 hours after the baby's birth, the newborn's coloring was abnormal several times. When Mrs. Gendek informed a nurse that her baby's hands and feet were purple, the nurse responded, "he's fine, honey, just cover him up with two blankets." Id. at 971.

Approximately 24 hours after the baby was born, nurses found him unresponsive and began cardiopulmonary resuscitation. Several nurses ran into Mrs. Gendek's room, told her that her baby was having a problem, and that "she should go to the nursery at once." She observed a medical team huddled around her son, "pumping his chest," and a minister was present. One of the nurses told her to call her husband and a family priest, if she had one. Mrs. Gendek called her husband and told him to "come to the hospital immediately because [the baby] was 'not breathing.'" Id. at 972.

12

The baby's heartbeat was restored. During the subsequent course of treatment, he was transferred to another hospital and back to the original medical center. Doctors implanted permanent ventilator and nutritive tubes in his body. Nurses' notes from both facilities reflect that Mr. and Mrs. Gendek were constantly at their son's bedside, where "they witnessed [him]experiencing severe convulsions, undergoing suction treatment, treatment, and enduring numerous intravenous treatments, examinations, and tests, including ice water in his ears, fingers down his throat, and poking of his eyes." Id. Forty-five days after the baby's birth, the Gendiks decided to withdraw artificial life support and their baby died.

The Gendek Court noted that neither Mr. nor Mrs. Gendek observed any act of malpractice; Mrs. Gendek observed only the non-negligent resuscitative efforts of the medical team and Mr. Gendek arrived after the baby had been resuscitated. "More importantly, neither Mr. nor Mrs. Gendek immediately connected any act of malpractice with [their baby's] respiratory failure or the need to perform emergency medical procedures." Id. at 975.

Similarly, here, Mr. Torres has not shown that he contemporaneously observed the malpractice and its effects on the victim and that he had been shocked by the results, as required by Carey and Gendek. The Gendek Court

acknowledged that "[m]edical malpractice giving rise to emotional-injury claims can involve obstetrical malpractice that occurs in the course of pregnancy with resultant serious or fatal injuries to the fetus or newborn and consequent severe emotional distress suffered by the parents." Id. at 973. The Court insisted, however, "that an immediate, close, and clear involvement or connection be present between a person suffering emotional distress and the conduct of the professional healthcare providers whose fault has contributed to the grave or fatal injuries of a related loved one." Id. at 976. While Mr. Torres was troubled as he observed the nurses adjusting the monitor on several occasions, similar to the efforts to resuscitate the Gendek baby, looking for a fetal heart rate was not negligent. Additionally, the record does not support a finding that Mr. Torres immediately connected any act of malpractice with injury to his son.

## Conclusion

For these reasons, and the concerns expressed during oral argument, Defendants' motions for partial summary judgment on Plaintiff Ruben Torres's claim for emotional distress damages [37, 40, 43] will be granted.

An appropriate Order will issue.

Dated: December 19, 2017                /s/ Joseph H. Rodriguez
                           Joseph H. Rodriguez
                              U.S.D.J.